ORIGINAL

FILED

DEC 1 9 2016

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NEIGHBORHOOD HEALTH PLAN          )
INCORPORATED, a Non-Profit        )
Corporation,                      )
                                  )
Plaintiff,                        )
                                  )    No.:
v.                                )
                                  )    16-1659 'C
THE UNITED STATES OF AMERICA,     )
                                  )
Defendant.                        )
                                  )

## COMPLAINT

1.    Plaintiff Neighborhood Health Plan Incorporated ("Plaintiff" or "NHP") is a Massachusetts non-profit health insurance company that operates only in Massachusetts.  NHP is owed millions of dollars from Defendant the United States of America ("Defendant," "United States," or "Government") under the risk corridors program (the "Risk Corridors Program") of the Patient Protection and Affordable Care Act (the "ACA" or the "Act").

2.    The ACA significantly changed the health insurance market in Massachusetts and nationwide.  By providing financial assistance for individuals to purchase Qualified Health Plans ("QHPs") on the new Health Insurance Marketplaces (the "Exchanges"), and through several other health insurance market reforms, the ACA created access to affordable health insurance for millions of previously uninsured Americans.  These market reforms included, among others, prohibiting health insurers from denying coverage or setting premiums based on health status or medical history.

3.    Due to the ACA's changes to the laws governing health insurance, and the absence of experience with the Exchanges, insurers lacked sufficient information and experience to allow them to accurately set premiums for QHPs.  Specifically, insurers lacked information

1

RECEIVED - USCFC

DEC 1 9 2016

regarding the number, health, and health expenses of the new enrollees that would enroll in QHPs.

4.      To encourage insurers to offer QHPs, Section 1342 of the ACA established three market stabilization programs, commonly called the 3Rs (the "3Rs") including a temporary three-year reinsurance program, a permanent risk adjustment program and the temporary three-year Risk Corridors Program.  The Risk Corridors Program is the focus of this Complaint.

5.      The Risk Corridors Program is a temporary three-year initiative designed to help insurers issuing QHPs weather short-term financial challenges caused by setting premium rates for a population about which the insurers lacked information.  The Risk Corridors Program was also intended to discourage insurers from increasing their cost estimates which would have led to higher premiums for consumers to purchase QHPs and increased the Government's liability for premium tax credits to help low-income individuals afford and purchase QHPs.

6.      Under the Risk Corridors Program, the Government is legally required to make specific payments – determined and published annually pursuant to a calculation mandated by statute and regulation – to participating insurers if their QHP's costs exceed target amounts during the first three years of the operation of the Exchanges (calendar years 2014, 2015 and 2016).  While a QHP will still incur a loss if its costs exceed the target amount, the temporary Risk Corridors Program will cover some of those losses.  Statute expressly provides that if a participating insurer's allowable QHP costs, for any plan year, are between 103 and 108 percent of the target amount, the Government must pay the insurer 50% of the amount in excess of 103 percent of the target amount; and if the insurer's allowable costs for any plan year are more than 108 percent of the target amount, the Government must pay the plan the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target

amount.  Conversely, if an insurer's QHP's allowable costs are lower than the target amount, the insurer must make risk corridors payments, in full, to the Government.

7.      The amounts owed to NHP are expressly provided for by statute, regulation, and contract.  Such amounts are not in dispute and are specifically determinable as an accounting matter.  The United States has acknowledged its obligations to make full risk corridors payments to NHP – and other insurers – and has recorded or will record those amounts as payment obligations of the Government.  However, the Government has failed to pay the acknowledged amounts, and has publicly acknowledged that it does not anticipate meeting its current and future obligations.

8.      The United States has admitted its statutory and regulatory obligations to pay the full amount of risk corridors payments owed to QHPs, but has failed to make the required payments. In 2014, the Government owed over $2.5 billion to insurers.

9.      In lieu of making full risk corridors payments of money owed to insurers, the Government arbitrarily paid NHP, and other insurers, only a pro-rata share of roughly 12.6% of the total amount due for 2014. The Government recently announced that it will make no payments for 2015 risk corridors monies owed.  In addition, the Government is now asserting – despite its early representations and inducements to insurers – that full payment is limited by available appropriations, even though no such limits appear anywhere in the ACA or its implementing regulations or in NHP's contracts with the Government.

10.      This action seeks damages from the Government of at least $29,878,000.04 which represents the total amount of outstanding risk corridors payments amounts owed to NHP for 2014 and the estimated amounts for 2015.

11.     NHP also seeks declaratory relief from the Court regarding the Government's obligation to make full and timely risk corridors payments for 2014, 2015 and 2016, in accordance with the United States' legal obligations.  The law is clear, and the United States must abide by its statutory obligations. NHP respectfully asks the Court to compel the Government to meet its obligations.

12.     NHP therefore brings this action to recover damages and for declaratory relief for: (1) Defendant's failure to make mandatory risk corridors payments in violation of Section 1342 of the ACA and its implementing federal regulations; (2) Defendant's failure to make risk corridors payments in breach of its express and/or implied-in-fact contractual obligations; (3) Defendant's breaches of the covenant of good faith and fair dealing implied in Defendant's contracts with NHP; and (4) Defendant's unlawful taking of NHP's property without just compensation in violation of the Fifth Amendment of the U.S. Constitution.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action and venue is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because NHP brings claims for damages over $10,000 against the United States, and these claims are founded upon the Government's violations of a money-mandating Act of Congress, a money-mandating regulation of an executive department, an express contract and/or an implied-in-fact contract with the United States, and a taking of Plaintiff's property in violation of the Fifth Amendment of the U.S. Constitution.

14.     The actions and/or decisions of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") at issue in this lawsuit were conducted on behalf of the Defendant United States within the District of Columbia.

## PARTIES

15.     NHP is a non-profit Massachusetts corporation with a principal place of business at 253 Summer Street, Boston, MA 02210.

16.     NHP is a QHP issuer serving over Sixty Thousand individuals on the Massachusetts Exchange (the "Connector"). NHP has been providing affordable, high quality health plans, with access to some of the best hospitals in the world, for over 30 years. Under the ACA, NHP has offered QHPs since 2014.

17.     Defendant is the United States of America.  HHS and CMS are agencies of the Defendant United States of America.  These Government Agencies are responsible for overseeing the administration of the ACA.

## FACTUAL ALLEGATIONS

18.     In 2010, Congress enacted the ACA – Pub. L. No. 111-148, 42 U.S.C. § 18001, *et seq.*

19.     The ACA aimed to increase the number of Americans covered by health insurance and reduce the cost of health care in the United States through several market reforms. These new reforms imposed new requirements on health insurers, including but not limited to, prohibiting insurers from denying coverage to individuals due to pre-existing conditions, barring insurers from charging higher premiums based on a person's health, and by requiring QHPs to meet certain provider network adequacy standards and include certain essential health benefits in QHPs.

20.     The ACA provides that "each health insurance issuer that offers health insurance coverage in the individual … market in a State must accept every … individual in the State that applies for such coverage." ACA – Pub. L. No. 111-148, § 2702(a) (codified at 42 U.S.C. § 300gg-1(a)).

21.     Beginning on January 1, 2014, individuals and small businesses were permitted to purchase private health insurance through competitive statewide marketplaces, or as it is called in Massachusetts, the Connector.

22.     NHP participated and offered QHPs on the Connector in both 2014 and 2015. NHP is also currently participating and offering QHPs on the Connector in 2016.

**NHP's Agreements with the Government**

23.     As noted, *supra*, one major aspect of the ACA's health care overhaul was the establishment of the Exchanges, which offered consumers organized platforms to shop for coverage with specified benefit levels.  Through the establishment of these Exchanges, the Government sought to create "competitive environments in which consumers can choose from a number of affordable and high quality health plans." Steven Sheingold, et al., *Competition and Choice in the Health Insurance Marketplaces, 2014-2015: Impact on Premiums,* ASSISTANT SEC'Y FOR PLANNING AND EVALUATION ISSUE BRIEF (July 27, 2015), at 1, available at https://aspe.hhs.gov/sites/default/files/pdf/108466/rpt_MarketplaceCompetition.pdf.

24.     To offer plans on the Connector NHP was required to, among other requirements, comply with all standards set forth in Section 1311(c) of the ACA, comply with all state specific requirements, comply with all regulatory requirements, certify that its plans were QHPs, and enter into an agreement with the Government through the Connector (the "QHP Agreement"). See **Exhibit 1** *Agreement between The Commonwealth Health Insurance Connector Authority*

6

*(Health Connector) and Neighborhood Health Plan, Dated as of October 1, 2013* (the "2014 QHP Agreement"); **Exhibit 2** *First Amendment to Agreement Between The Commonwealth Health Insurance Connector Authority and Neighborhood Health Plan, dated as of January 1, 2015* (the "2015 QHP Agreement"); and **Exhibit 3** *Second Amendment to Agreement Between The Commonwealth Health Insurance Connector Authority and Neighborhood Health Plan, dated as of January 1, 2016* (the "2016 QHP Agreement").

25.     The 3Rs – the financial risk program created by the Government – which includes the Risk Corridors Program, was a significant factor in NHP's decision to agree to execute the QHP Agreement, offer QHPs on the Connector, and undertake the many responsibilities and obligations required of NHP by the Government to participate on the Connector.

<strong>The Risk Corridors Program</strong>

26.     Section 1342 of the ACA expressly requires the Secretary of HHS to establish the Risk Corridors Program that provides for the sharing in gains or losses between the Government and certain participating health plans in the individual and small group markets.  *See* ACA, Pub. L. No. 111-148, § 1342 (codified at 42 U.S.C. § 18062).

27.     QHP issuers are required to participate in the Risk Corridors Program.

28.     As stated, *supra*, to help protect health insurers against the risks inherent in covering a new, previously uninsured population, with little information regarding the new population, the ACA established three premium stabilization programs, the 3Rs. One is relevant to this action, the Risk Corridors Program.

29.     The goal of the Risk Corridors Program is to provide insurers with payment stability as insurance reforms are implemented and the insurance markets adjust to the reforms.

7

30.     By enacting Section 1342 of the ACA, Congress recognized that, due to uncertainty about the new population entering the Exchanges during the first few years, health insurers may not be able to predict their risk accurately, and their premiums may reflect costs that are ultimately lower or higher than predicted.

31.     Pricing premiums for this new population is hard because the ultimate net risk profile of the population is unknown, as insurers like NHP have none of the information typically used to set premiums and risk adjustment transfer payments.  NHP could have protected itself financially by setting unreasonably high premium rates to ensure it took in more money than it would pay out in claims. However, such a strategy would not only be morally questionable but legally questionable for a public charity and completely adverse to the mission of the ACA.

32.     Instead, NHP relied on the Risk Corridors Program, to keep premiums affordable. Without the Government's promise and obligation to carry out the Risk Corridors Program, NHP's premium rates for its QHPs would have been significantly higher.

33.     Backed by the full faith and credit of the United States Government, the financial protections provided for in the statutory Risk Corridors Program include mandatory risk corridors payments from the Government to participating health insurers in their respective states' Exchanges.

34.     NHP, in good faith, has continually demonstrated its willingness to be a meaningful partner in the ACA program by expanding health care coverage and providing quality health insurance products at affordable rates.

35.     The Government however, has abdicated its responsibility under the Risk Corridors Program and failed to honor its statutory, regulatory, contractual, and public

commitments regarding the premium stabilization programs, including the Risk Corridors Program.

36.    The Risk Corridors Program applies only to participating plans that agree to accept the responsibility and obligations of issuing QHPs. All insurers which elect to enter into agreement with the Government to become QHPs are required under Section 1342(a) of the ACA and the QHP Agreements to participate in the Risk Corridors Program established and run by the Defendant.  *See also* **Exhibits 1, 2, and 3.**

37.    Through the Risk Corridors Program, the Government shares risk with QHP issuers by collecting charges from a health insurer if the insurer's QHP premiums exceed claimed costs of QHP enrollees by a certain amount, and by making payments to the insurer if the insurer's QHP premiums fall short by a certain amount, subject to certain adjustments for taxes, administrative expenses, and other costs and payments.

38.    Congress intended the ACA's temporary Risk Corridors Program as an essential safety valve for consumers and insurers as millions of Americans would transition to new coverage in a never before used marketplace. The Risk Corridors Program was designed to protect against uncertainty that health insurers, like NHP, would face when estimating enrollments and costs resulting from the market reforms by creating a mechanism for sharing risk between the Government and issuers of QHPs in each of the first three years of the new regulatory scheme and Exchanges.

39.    Congress, through Sections 1342(b)(1) and (2) of the ACA, expressly established the payment methodology and formula for the Risk Corridors Program:

(b) **Payment methodology**

   **(1) Payments out**

The Secretary *shall* provide under the program established under subsection (a) that if—

        (A) a participating plan's allowable costs *for any plan year* are more than 103 percent but not more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

        (B) a participating plan's allowable costs *for any plan year* are more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

**(2) Payments in**

The Secretary shall provide under the program established under subsection (a) that if—

        (A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

        (B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

ACA, Pub. L. No. 111-148, § 1342(b) (codified at 42 U.S.C. § 18062(b)) (emphasis added).

    40.      HHS implemented the Risk Corridors Program in the Code of Federal

Regulations at 45 C.F.R. § 153.510. In relevant part, Section 153.510 states:

(b) **HHS** **payments to** health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

        (1) When a QHP's allowable costs *for any benefit year* are more than 103 percent but not more than 108 percent of the target amount, *HHS will pay the QHP issuer* an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

        (2) When a QHP's allowable costs *for any benefit year* are more than 108 percent of the target amount, *HHS will pay to the QHP issuer* an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

Risk Corridors Establishment and Payment Methodology, 45 C.F.R. § 153.510(b) (2016) (emphasis added).

41.     Whether a QHP makes a risk corridors payment or receives a risk corridors payment depends upon comparing the QHP's allowable costs (claims costs subject to adjustments for health care quality, health IT, risk adjustment payments and charges and reinsurance payments) with the target amount (the difference between a QHP's earned premiums and allowable administrative costs).

42.     Pursuant to the Section 1342(b) formula, each year from 2014 through 2016, QHPs with allowable costs that are less than 97 percent of the QHP's target amount are required to remit charges for a percentage of those cost savings to HHS, while QHPs with allowable costs greater than 103 percent of the QHP's target amount will receive payments from HHS to offset a percentage of those losses. For example, a QHP that has a target amount of $10 million in a given calendar year will not pay a risk corridors charge or receive a risk corridors payment if its allowable costs range between $9.7 million and $10.3 million for that calendar year.

43.     HHS and CMS provided specific examples of risk corridors payment and charge calculations beyond the three percent threshold – published in the Federal Register dated July 15, 2011 at 76 FR 41930-01, 41943 – which illustrate risk corridors payments the Government must pay under different allowable costs, target amounts, and gain and loss scenarios. *See* 76 FR 41930-01, 41943 (July 15, 2011).

44.     The American Academy of Actuaries provided an approximate illustration of risk corridors payment methodology – excluding the charge or payment of 2.5 percent of the target amount for gains and losses greater than 8 percent – as follows:

Source: American Academy of Actuaries, *Fact Sheet: ACA Risk-Sharing Mechanisms* (2013), *available at* http://actuary.org/files/ACA_Risk_Share_Fact_Sheet_FINAL120413.pdf

45.     In 2014 and 2015, NHP experienced allowable costs in excess of its target amount, making NHP eligible to receive risk corridors payments required under Section 1342 of the ACA.

46.     The Government has failed to make full and timely payments for 2014 and has made zero risk corridors payments applicable to calendar year 2015.

47.     Congress did not impose any financial limitations or restraints on the Government's mandatory risk corridors payments to QHPs in either Section 1342 or any other section of the ACA.

48.     Congress also did not limit, in any way, the Secretary of HHS's obligation to make full risk corridors payments to QHPs due to appropriations, restriction on the use of funds, or otherwise in Section 1342 or anywhere else in the ACA.

49.     Congress has not amended Section 1342 since enactment of the ACA.

50.     Congress has not repealed Section 1342 of the ACA.

51.     HHS and CMS are mandated to pay 100 percent of the risk corridors payments due NHP for calendar years 2014, 2015, and once calculated and if owed, 2016.

52.     On March 11, 2013, HHS publicly affirmed that the Risk Corridors Program is not statutorily required to be budget neutral by stating that, "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342 of the Affordable Care Act." 78 FR 15410-01, 15473 (Mar. 11, 2013).

53.     In executing the QHP Agreements with CMS, Plaintiffs relied upon HHS's commitments to make, if necessary, full risk corridors payments, annually, to it as required in Section 1342 of the ACA regardless of whether risk corridors payments to QHPs are actually greater than risk corridors charges collected by the Government from QHPs for a particular calendar year.

54.     The United States, however, has only made partial payment for 2014.

55.     The United States has made zero 2015 risk corridors payments, and has announced that it will not make payment in 2016, of the required risk corridors payment amounts for 2015.

**The Government's Recognition of Risk Corridors Payment Obligations**

56.     Since Congress's enactment of the ACA in 2010, HHS and CMS have repeatedly and publicly acknowledged and confirmed their statutory and regulatory obligations to make full and timely – *i.e.,* annual – risk corridors payments to qualifying QHPs.

57.     These public statements by HHS and CMS were made by representatives of the Government who had actual authority to bind the United States.

58.     HHS and CMS intended for QHPs to rely on these public statements to assume and continue their QHP status, and participate on the Exchanges.

59.     Additionally, HHS and CMS made these public statements to induce QHPs to participate on the Exchanges.

13

60.     On July 11, 2011, HHS issued a fact sheet on HealthCare.gov, "Affordable Insurance Exchanges: Standards Related to Reinsurance, Risk Corridors and Risk Adjustment," stating that under the Risk Corridors Program, "qualified health plan issuers with costs greater than three percent of cost projections *will receive payments* from HHS to offset a percentage of those losses." *Affordable Insurance Exchanges: Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, HEALTHCARE.GOV (July 11, 2011) (emphasis added).

61.     On March 23, 2012, HHS implemented a final rule regarding Standards Related to Reinsurance, Risk Corridors and Risk Adjustment. *See* Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment, 77 Fed. Reg. 17220-01 (Mar. 23, 2012). Although HHS did not expressly propose deadlines for making risk corridors payments, HHS stated that "QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers." *Id.* at 17238.

62.     The payment deadline for QHP issuers to pay HHS under the risk corridors program is, for each applicable year, "within 30 days after notification of such charges" by the Government. *See* 45 C.F.R. § 153.510(d).

63.     On March 11, 2013, HHS publicly affirmed that the Risk Corridors Program is *not* statutorily required to be budget neutral, *i.e.*, payments into the program do not have to equal payments out of the program. *See* HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15410-01 (Mar. 11, 2013). HHS confirmed that, "Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act." *Id.* at 15473. Most recently, on September 14, 2016, Andrew Slavitt, the Acting Administrator of CMS, testified at a joint hearing of Subcommittees within the Committee on Energy and Commerce. When asked whether CMS takes the position that

14

insurance plans are entitled to be made whole on risk corridors payments, even if there is no congressional appropriation to do so, Mr. Slavitt responded under oath: "Yes. It is an obligation of the federal government." Energy and Commerce Committee, *The Affordable Care Act on Shaky Ground: Outlook and Oversight* (Sept. 14, 2016), available at https://energycommerce.house.gov/hearings-and-votes/hearings/affordable-care-act-shaky-ground-outlook-and-oversight.

64.     The statute is clear that the Government will share in the losses for plans with higher than anticipated costs so that if, hypothetically, all plans have higher than anticipated costs, the Government would need to make full payments to each plan, even though there would be no insurer payments coming in. The Risk Corridors Program thus could not have been subject to budget neutrality and still in accord with Congressional intent. Had the program been cabined by budget neutrality concerns, the ACA would have failed to attract sufficient entrants into the marketplace because the investment would have been too risky, as payments owed could easily swamp payments made into the program (as actually happened). HHS's timely payment to plans under the Risk Corridors Program is essential to realizing the ACA's intent that the program stabilize premiums. Indeed, Section 1342 of the ACA is modeled for just that reason on the Medicare Part D program, which also is not required to be budget neutral. *See* Risk Sharing Arrangements, 42 C.F.R. § 423.336 (2016).

65.     In deciding to enter into the QHP Agreement with the Government, NHP relied upon HHS's commitments to make full risk corridors payments annually, as required by Section 1342 of the ACA, regardless of whether risk corridors payments to QHP were greater than risk corridors charges collected from QHPs for a particular calendar year.

**The Government Breaks its Promise and Statutory Obligation to Make Full and Timely**

**Risk Corridors Program Payments**

66.      As stated *supra*, since its enactment, Congress has not altered the Government's

obligations under the Risk Corridors Program.  However, the Government has taken steps to

actively frustrate the intent and purpose of the program: the timely and complete annual payment

to QHP issuers in order to permit them to financially survive, learn, and adapt to this previously

unknown population and new market.

67.      The first such attempt was in March of 2014, where HHS stated in the Federal

Register that "HHS intends to implement this [risk corridors] program in a budget neutral

manner."  HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744-01,

13,829 (Mar. 11, 2014).

68.      However, HHS goes on to state that "initial modeling suggests that this

adjustment for the transitional policy could increase the total risk corridors payment amount

made by the Federal government and decrease risk corridors receipts, resulting in an increase in

payments.  However, we estimate that even with this change, the risk corridors program is *likely*

to be budget neutral" *Id.* (emphasis added).

69.      The above cited guidance is a departure from what the ACA intended and requires

and what the implementing regulation reflected: that the Risk Corridors Program had been

enacted without regard to annual budget neutrality.  Indeed, one year earlier, HHS clearly states

"[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the

balance of payments and receipts, HHS will remit payments as required under Section 1342 of

the Affordable Care Act."  HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed.

Reg. at 15,473.

70.     Additionally, HHS issued the March 2014 guidance after QHP issuers – NHP included – were required to execute the QHP Agreement and agree to sell QHPs on the Exchanges. *See* **Exhibit A** (2014 QHP Agreement dated as of 10/1/2013).

71.     After inducing insurers to issue QHPs on the Exchanges, and locking them into the Exchanges, the Government attempted to change its promise, required by statute and regulation, to make full and timely risk corridors payments.

72.     Then, in April 2014, CMS issued a statement entitled "Risk Corridors and Budget Neutrality," stating:

> if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

CMS, *Risk Corridors and Budget Neutrality* (Apr. 11, 2014), at 1, available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf.

73.     On December 16, 2014, Congress enacted the "Consolidated and Further Continuing Appropriations Act, 2015" (the "2015 Appropriations Act"). *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130.

74.     In the 2015 Appropriations Act, Congress specifically targeted the Government's existing, mandatory risk corridors payment obligations owed to QHPs, including NHP, under Section 1342 of the ACA, limiting appropriations for those payment obligations from three large funding sources by including the following text at Section 227 of the 2015 Appropriations Act:

> *None of the funds* made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare

17

> and Medicaid Services—Program Management" account, *may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).*

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 227, 128 Stat. 2491 (emphasis added).

75.     Section 1342(b)(1) of Public Law 111-148 – referenced immediately above – is

the ACA's prescribed methodology for the Government's mandatory risk corridors payments to

QHPs.

76.     In passing the 2015 Appropriations Act, Congress did not amend or repeal

Section 1342 of the ACA.

77.     Congress's failure to appropriate sufficient funds for risk corridors payments,

without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate

the United States' statutory obligation created by Section 1342 of the ACA to make full and

timely risk corridors payments to QHPs, including NHP.

78.     On October 1, 2015, after collecting risk corridors data from QHPs for 2014, HHS

and CMS announced that they intended to prorate the risk corridors payments owed to QHPs,

including Plaintiff, for 2014, stating that:

> Based on current data from QHP issuers' risk corridors submissions, issuers will pay $362 million in risk corridors charges, and have submitted for $2.87 billion in risk corridors payments for 2014. **At this time, assuming full collections of risk corridors charges, this will result in a proration rate of 12.6 percent.**

CMS, *Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015), available at

https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-

Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf (emphasis in original).

79.     HHS and CMS further announced on October 1, 2015 that they would begin collecting full risk corridors charges from QHPs in November 2015, and would begin making the prorated risk corridors payments to QHPs starting in December 2015. *See id.*

80.     More recently, on April 1, 2016, CMS reaffirmed in a letter to another QHP that - although "remaining risk corridors claims will be paid" - the amounts owed would be delayed and contingent upon the Government's receipt of sufficient risk corridors charges/collections for 2015 and/or 2016. Letter from Kevin J. Counihan, CEO of Health Insurance Marketplaces & Dir. of CCIIO, to David L. Holmberg, President & CEO of Highmark Health (Apr. 1, 2016). The Government has thus left QHPs to guess when—if ever—the United States will make the 2014 risk corridors payments it owes.

81.     HHS and CMS have failed to cite to any statutory authority for their unilateral decision to make only partial, prorated risk corridors payments.

82.     Recognizing that the United States was acting in a manner adverse to its statutory and regulatory requirements, on November 19, 2015, HHS and CMS issued a bulletin acknowledging the Government's obligation to make full risk corridors payments.

> HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligation [*sic*] of the United States Government for which full payment is required.

CMS, *Risk Corridors Payments for the 2014 Benefit Year* (Nov. 19, 2015), available at

https://www.cms.gov/CCIIO/Resources/Regulations-and-

Guidance/Downloads/RC_Obligation_Guidance_11-19-15.pdf.

83.     Despite acknowledging, again, its obligation to make full payments to QHP issuers, the Government has refused to make full and timely payments of amounts owed.

84.    On December 18, 2015, Congress enacted the "Consolidated Appropriations Act, 2016" (the "2016 Appropriations Act"). *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242.

85.    In the 2016 Appropriations Act, Congress again specifically targeted the Government's existing, mandatory risk corridors payment obligations owed to QHPs, including Plaintiff, under Section 1342 of the ACA, limiting appropriations for those payment obligations from three large funding sources by including the following text at Section 225 of the 2016 Appropriations Act:

> *None of the funds* made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, *may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).*

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 225, 129 Stat. 2624 (emphasis added).

86.    As stated *supra,* Section 1342(b)(1) of Public Law 111-148 is the ACA's prescribed methodology for the Government's mandatory risk corridors payments to QHPs.

87.    In passing the 2016 Appropriations Act, Congress did not amend or repeal Section 1342 of the ACA.

88.    Congress's failure to appropriate sufficient funds for risk corridors payments, without modifying or repealing Section 1342 of the ACA, did not defeat or otherwise abrogate the United States' statutory obligation created by Section 1342 to make full and timely risk corridors payments to QHPs, including NHP.  While Congress has the power to amend legislation through an appropriations act, it can only do so when the text of the act expressly provides for such a modification.

89.     The mere failure to appropriate funds does not, by itself, relieve the Government of its obligation under the ACA, or any other statute, to make payments obligated by statute.

90.     Indeed, a "cardinal rule" of statutory interpretation is that "repeals by implication are not favored." *Morton v. Mancari*, 417 U.S. 535, 549 (1974). The doctrine disfavoring repeals by implication "applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978). Even when Congress acts deliberately to appropriate less than is owed under a statutory obligation, the obligation remains in place absent explicit language repealing the obligation. *See New York Airways, Inc. v. United States,* 177 Ct. Cl. 800, 810 (Ct. Cl. 1966) ("[T]he mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.").

91.     Neither the 2015 Appropriations Act nor the 2016 Appropriations Act repealed or altered the mandatory risk corridors payment obligations as they are set forth in the plain text of the ACA at Section 1342.

92.     Despite any statements by CMS which seem contradictory to its statutory obligations, as stated *supra*, CMS's acting administrator testified under oath before Congress and reaffirmed the Government's obligation to make statutorily required risk corridors payments, in full, to insurers.

### The United States Fails to Pay Money Owed to NHP

93.     As stated *supra*, the United States has stated it will not make full and timely risk corridors payments to QHPs for 2015 and that all risk corridors payments to QHPs for 2014 will be pro-rated instead of paid in full.

94.     As stated *supra*, the Government continues to require QHP issuers that have to pay into the Risk Corridors Program to pay 100 percent of their obligation, "[r]isk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below.  Only risk corridors payment amounts are prorated."  CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), at 1, available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf.

95.     As shown *supra,* the statutory wording in Section 1342 of the ACA for an insurer making payments to the government and an insurer receiving payments from the Government is identical. Either the insurer "shall pay" the Government or the Government "shall pay" the insurer.

96.     Pursuant to Section 1342's statutory calculation, NHP's losses in the ACA Massachusetts Individual Market for plan year 2014 resulted in the Government being required to pay NHP a risk corridors payment of $7,389,737.55. CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), at 13, available at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf

97.     Pursuant to Section 1342's statutory calculation, NHP's losses in the ACA Massachusetts Small Group Market for plan year 2014 resulted in the Government being required to pay NHP a risk corridors payment of $10,543,621.21. *Id.*

98.     For the Individual Market, the Government announced, however, that it would only pay NHP a prorated amount of $932,427.22. *Id.*

99.     For the Small Group Market, the Government announced, however, that it would only pay NHP a prorated amount of $1,330,380.05. *Id.*

100.    For 2014, NHP did not have profit that resulted in NHP being required to remit risk corridors charges to the Secretary of HHS. *See generally id.*

101.    If NHP had profit that required it to remit charges to the Secretary of HHS, NHP – unlike the Government – would have been required to remit 100% of its obligations to the Government.

102.    HHS lacks the authority, under statute, regulation or contract to withhold full and timely 2014 risk corridors payments from QHPs such as NHP.  The Government owes NHP $15,670,506.49 for 2014 risk corridors payments.

### Risk Corridors Payment and Charge Amounts for 2015

103.    As stated *supra*, the United States has stated it does not intend to make any 2015 risk corridors payments.

104.    The 2015 Appropriations Act, specifically withheld appropriations from three large funding sources for the Government's risk corridors payments, although, again, Congress did not alter or repeal the Government's risk corridors payment obligation. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 225, 129 Stat. 2624.

105.    HHS and CMS have repeatedly announced that risk corridors payments are obligations of the Government and that 2015 risk corridors collection will first be paid out towards the 87.4% of 2014 risk corridors payments from the Government that remain outstanding. These outstanding payments are a direct result from the Government failing to provide full and timely 2014 risk corridors payments. CMS, *Risk Corridors and Budget Neutrality* (Apr. 11, 2014), at 1; Exchange and Insurance Market Standards for 2015 and

Beyond, 79 Fed. Reg. 30,240-01, 30,260 (May 27, 2014) ("[I]f risk corridors collections in the first or second year are insufficient to make risk corridors payments as prescribed by the regulations, risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and remaining funds will then be used to fund current year payments.")

106.     Standard & Poor's Ratings Services predicted on November 5, 2015 that "the 2015 risk corridor [will] be significantly underfunded if external funding is not added to the risk corridors funds. We estimate that the amount of underfunding in 2015 could be close to what it was for 2014. In addition, the 2015 corridor will not have adequate funds to cover the 2014 deficit." Standard & Poor's Ratings Services, *The ACA Risk Corridor Will Not Stabilize The U.S. Health Insurance Marketplace In 2015* (Nov. 5, 2015), available at https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1476233&SctArtId =352088&from=CM&nsl_code=LIME&sourceObjectId=9401106&sourceRevId=5&fee_ind=N &exp_date=20251105-19:10:01

107.     Despite these projections, HHS and CMS continued to publicly tell QHP issuers that corridors collections will be sufficient to pay for all risk corridors payment.  "We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments over the life of the three-year program. However, we will establish in future guidance or rulemaking how we will calculate risk corridors payments if risk corridors collections (plus any excess collections held over from previous years) do not match risk corridors payments as calculated under the risk corridors formula for the final year of the program." CMS, *Risk Corridors and Budget Neutrality* (Apr. 11, 2014), at 2.

108.   Pursuant to Section 1342's statutory calculation and as published by CMS, NHP's losses in the ACA Massachusetts Individual Market for plan year 2015 resulted in the Government being required to pay NHP a risk corridors payment of $7,881,196.72. *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2015* (Nov. 19, 2015), at 6, available at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf

109.   Pursuant to Section 1342's statutory calculation and as published by CMS, NHP's losses in the ACA Massachusetts Small Group Market for plan year 2015 resulted in the Government being required to pay NHP a risk corridors payment of $6,922,012.85. *Id.*

110.   Despite owing $14,803,209.57 for 2015, the Government expects to pay NHP only $595,716.02 towards its outstanding debt *for 2014 risk corridors payments*. This payment is scheduled for December 2016. *Id.*

111.   Assuming NHP receives the December 2016 payment, NHP will have received only $2,858,523.29 of the $32,736,568.33 total amount owed in risk corridors payments by the Government under Section 1342 of the ACA.

112.   The Government is required under statute to make these payments, in full, to NHP.

**QHPs' and NHP's Efforts to Resolve Risk Corridors Payment Issues Out of Court**

113.   Since learning of HHS's and CMS's decision not to make full risk corridors payments owed in a timely manner, QHPs have made significant efforts to resolve the issue out of court.  Unfortunately, their efforts to persuade HHS and CMS to honor the Government's statutory, regulatory and contractual obligations to make full and timely risk corridors payments have been unsuccessful to date.

114.    On March 17, 2016, another QHP that is owed risk corridors payments for 2014 sent a formal demand letter to HHS and CMS. *See* Letter from David L. Holmberg, President and CEO of Highmark Health, to Kevin J. Counihan, CEO of Health Insurance Marketplaces and Director of CCIIO (Mar. 17, 2016). *See* **Exhibit 6.**

115.    The Government responded to the QHP's March 17, 2016 demand letter on April 1, 2016, affirming that "remaining risk corridors payments will be paid," but repeating the Government's plan to make such payments out of 2015 risk corridors collections, and if necessary, 2016 collections - a position that is without support in Section 1342 or its implementing regulations. Letter from Counihan to Holmberg (Apr. 1, 2016). *See* **Exhibit 7.**

116.    The Government's position on when the risk corridors payments must be made is contrary to the nature, purpose, intent, and language of Section 1342 of the ACA and its implementing regulations, as well as the Risk Corridors Program's role within the ACA as a temporary program designed to mitigate the potentially significant risks posed *each year* within the first three years of the Exchanges.

117.    Indeed, Section 1342(b)(1) of the ACA provides that the Secretary "shall pay to the plan" a certain amount if the plan's allowable costs "for any plan year" exceed the targeted amount by a certain threshold. ACA, Pub. L. No. 111-148, § 1342(b)(1) (codified at 42 U.S.C. § 18062(b)(1)).

118.    The Government's Response Letter of April 1, 2016, states Defendant's final position regarding its refusal to fully and timely pay risk corridors payments owed for 2014 and 2015 to QHPs, including NHP. *See* Letter from Counihan to Holmberg (Apr. 1, 2016).

119.    On information and belief, there are no administrative avenues NHP is required to take before bringing this action. Even if there were, to the extent required, Plaintiff has exhausted

any required non-judicial avenues to remedy the Government's failure to provide the full and timely mandated risk corridors payments or any such avenues are futile.

## COUNT I

### Violation of Federal Statutory and Regulatory Mandate to Make Payments

120.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

121.    Section 1342(b)(l) of the ACA mandates compensation, expressly stating that the Secretary of HHS "shall pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the statute.

122.    HHS and CMS's implementing regulation at 45 C.F.R. § 153.510(b) also mandates compensation, expressly stating that HHS "will pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the regulation, which formula is mathematically identical to the formula in Section 1342(b)(1) of the ACA.

123.    HHS and CMS's regulation at 45 C.F.R. § 153.510(d) requires a QHP issuer to remit charges to HHS within thirty (30) days after notification of such charges.

124.    HHS and CMS's statements in the Federal Register on July 15, 2011 and March 23, 2012, state that risk corridors "payment deadlines should be the same for HHS and QHP issuers." Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,929, 41,943 (proposed July 15, 2011); Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. at 17238.

125.    NHP was a QHP in 2014, 2015, and 2016 and was qualified for and entitled to receive mandated risk corridors payments from the Government for 2014 and 2015. The amount of 2016 payments has yet to be determined.

126.     NHP is entitled under Section 1342(b)(l) of the ACA and 45 C.F.R. § 153.510(b) to recover full and timely mandated risk corridors payments from the Government for 2014 and 2015.

127.     In the 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $17,933,358.76 that the Government concedes it owes NHP for 2014.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), at 13.

128.     In the 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $14,803,209.57 that the Government concedes it owes NHP for 2015.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2015* (Nov. 19, 2015), at 6.

129.     The United States has failed to make full and timely risk corridors payments to NHP, despite the Government confirming in writing that Section 1342 of the ACA mandates that the Government make risk corridors payments.

130.     The United States has represented that it will not make full and timely payment for the risk corridors amounts owed for 2015.

131.     Congress' failure to appropriate sufficient funds for risk corridors payments due did not and could not defeat or otherwise abrogate the United States' statutory obligation created by Section 1342 of the ACA to make full and timely risk corridors payments to QHPs, including NHP.

132.     The Government's failure to make full and timely risk corridors payments to NHP constitutes a violation and breach of the Government's mandatory payment obligations under Section 1342(b)(l) of the ACA and 45 C.F.R. § 153.510(b).

133.    As a result of the United States' violation of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b), NHP has been and/or will be damaged in the amount of at least $29,878,000.04 together with interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT II

### Breach of Express Contract

134.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

135.    NHP entered into valid written QHP Agreements with the Connector for calendar years 2014, 2015, and 2016. *See* **Exhibit 1**, **Exhibit 2**, and **Exhibit 3**.

136.    The Connector was established pursuant to approval from the Government to serve as a health insurance exchange compliant with the ACA. **Exhibit 1**, Page 2.

137.    The 2014, 2015, and 2016 QHP Agreements were executed by representatives of the Government who had actual authority, and were entered into with mutual assent and consideration by both parties.

138.    The 2014, 2015, and 2016 QHP Agreements set forth the responsibilities of the parties and obligates NHP to comply with the Risk Corridors Program. **Exhibit 1** Page 23, Section 3.17.

139.    By agreeing to become a QHP in 2014, 2015, and 2016, NHP agreed to provide health insurance on the Connector, an Exchange established under the ACA, and agreed and attested to accept the obligations, responsibilities and conditions the Government imposed on QHPs under the ACA and, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq. See* **Exhibit**

29

**1**, Page 23, Section 3.17*; **Exhibit 4**, *2014* Qualified Health Plan Program Attestations (April 25, 2013); and **Exhibit 5** 2016 Qualified Health Plan Program Attestations (May 11, 2015).[1]

140.     The 2014, 2015, and 2016 QHP Agreements therefore incorporate the provisions of Section 1342(b)(l) of the ACA and 45 C.F.R. § 153.510(b) into the 2014, 2015, and 2016 QHP Agreements.

141.     NHP has satisfied and complied with its obligations and/or conditions under the 2014, 2015, and 2016 QHP Agreements.

142.     The Government's statutory and regulatory obligations to make full and timely risk corridors payments were significant factors material to NHP's agreement to enter into the 2014 QHP Agreement, 2015 QHP Agreement, and 2016 QHP Agreement.

143.     In the 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $17,933,358.76 that the Government concedes it owes NHP for 2014.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015) at 13.

144.     In the 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $14,803,209.57 that the Government concedes it owes NHP for 2015.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2015* (Nov. 19, 2015), at 6.

145.     The Government intends to only pay NHP $2,858,523.29 and only for 2014 risk corridors payments.

---

[1] Due to Exchange failures in Massachusetts, the Massachusetts Health Connector asked that no attestation be filed for 2015.  The Connector requested that health plans only submit new product information or changes to previously submitted documents.  However, NHP complied, at all times, with applicable federal, state, and local laws and regulations in the year of 2015.

146.    The Government does not intend to make full or timely payments to NHP of the amounts owed to NHP by the Government for the 2015 risk corridors payments.

147.    The Government's breach of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) by failing to make full and timely risk corridors payments to NHP is a material breach of the 2014, 2015 and 2016 QHP Agreements.

148.    Congress's failure to appropriate sufficient funds for risk corridors payments due did not and could not defeat or otherwise abrogate the United States' contractual obligation to make full and timely risk corridors payments to Plaintiff.

149.    As a result of the United States' violation of Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b), NHP has been and/or will be damaged in the amount of at least $29,878,000.04 together with interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing

150.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

151.    A covenant of good faith and fair dealing is implied in every contract, including those with the Government, and imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act to destroy the reasonable expectations of the other party regarding the fruits of the contract.

152.    The 2014, 2015 and 2016 QHP Agreements created a reasonable expectation for NHP. The United States has destroyed Plaintiff's reasonable expectations regarding the fruits of the 2014, 2015 and 2016 QHP Agreements in breach of the implied covenant of good faith and

fair dealing. The United States breached the implied covenant of good faith and fair dealing by, among other things:

   a.  Inserting in HHS and CMS regulations a 30-day deadline for a QHP's full remittance of risk corridors charges to the Government, but failing to make full payment of risk corridors payments to QHPs, despite stating that QHPs and the Government should be subject to the same payment deadline. *See e.g.,* Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. at 17,239.

   b.  Requiring QHPs to fully remit risk corridors charges to the Government, but unilaterally deciding, in direct violation of the ACA, that the Government may make prorated risk corridors payments to QHPs.

   c.  Making repeated statements regarding its obligation to make risk corridors payments, then depriving NHP of full and timely risk corridors payments after Plaintiff had fulfilled its obligations as a QHP by participating on the Connector for calendar years 2014, 2015 and 2016 and had suffered losses which the Government had promised would be shared through mandatory risk corridors payments.

   d.  In Section 227 of the 2015 Appropriations Act, legislatively targeting and limiting funding sources for 2014 calendar year risk corridors payments after NHP had undertaken significant expense in performing its obligations as a QHP on the Connector, based on the reasonable expectation that the Government would make full and timely risk corridors payments if NHP experienced sufficient losses in 2014.

e.   In Section 225 of the 2016 Appropriations Act, legislatively targeting and limiting funding sources for 2014 and 2015 calendar year risk corridors payments after NHP had undertaken significant expense in performing its obligations as a QHP on the Connector, based on the reasonable expectation that the Government would make full and timely risk corridors payments if NHP experienced sufficient losses in 2014 and 2015.

153.   In the 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $17,933,358.76 that the Government concedes it owes NHP for 2014.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), at 13.

154.   In the 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $14,803,209.57 that the Government concedes it owes NHP for 2015.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2015* (Nov. 19, 2015) at 6.

155.   The Government intends to pay NHP only $2,858523.29 of the $17,933,358.76 owed to NHP in 2014 risk corridors payments.

156.   As a direct and proximate result of the breach of the covenant of good faith and fair dealing, NHP has been damaged in the amount of at least $29,878,000.04 together with any losses actually sustained as a result of the Government's breach, and such other damages and relief as this Court deems just and proper.

## COUNT IV

### Breach of Implied-In-Fact Contract

157.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

158.    If this Court does not find that NHP and the Government had an express contract, NHP entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely risk corridors payments to NHP for calendar years 2014, 2015 and 2016 in exchange for NHP's agreement to become a QHP issuer and participate on the Connector.

159.    Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. § 153.510), and HHS's and CMS's admissions regarding their obligation to make risk corridors payments were made by representatives of the Government who had actual authority to bind the United States, and constituted a clear and unambiguous offer by the Government to make full and timely risk corridors payments to health insurers, including Plaintiff, that agreed to participate as QHPs in the 2014, 2015 and 2016 Exchanges.

160.    Such offer was made by CMS and HHS to induce QHPs, like NHP, to participate in the Exchanges.

161.    NHP accepted the Government's offer by agreeing to become a QHP and to participate in and accept the uncertain risks imposed by the Exchanges.

162.    By agreeing to become a QHP, Plaintiff agreed to provide health insurance on the Connector, and to accept the obligations, responsibilities, and conditions the Government imposed on QHPs - subject to the implied covenant of good faith and fair dealing - under the ACA and, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq.*

163.    NHP has satisfied and completed its obligations and/or conditions which existed under the implied-in-fact contracts.

164.    The Government's agreement to make full and timely risk corridors payments was a significant factor material to NHP's agreement to become a QHP issuer.

165.    The parties' agreement is further confirmed by the parties' conduct, performance and statements following NHP's acceptance of the Government's offer, and the Government's repeated assurances that full and timely risk corridors payments would be made and would not be subject to budget limitations.

166.    The implied-in-fact contract was authorized by representatives of the Government who had actual authority to bind the United States and was entered into with mutual assent and consideration by both parties.

167.    The Risk Corridors Program's protection from uncertain risk and new market instability was a real benefit that significantly influenced NHP's decision to agree to become a QHP and to participate in the 2014, 2015 and 2016 Connector.

168.    NHP, in turn, provided a real benefit to the Government by agreeing to become a QHP and participate on the Connector, despite the uncertain financial risk.

169.    The Risk Corridors Program in Section 1342 of the ACA and its implementing regulations, by which Congress, HHS, and CMS committed to help protect health insurers financially against risk selection and market uncertainty, encouraged NHP and similar QHP issuers to participate on the 2014, 2015, and 2016 Exchanges.

170.    The Government repeatedly acknowledged its statutory and regulatory obligations to make full and timely risk corridors payments to qualifying QHPs in 2014, 2015 and 2016 through its conduct and statements to the public and to NHP and other similarly situated QHPs, made by representatives of the Government who had actual authority to bind the United States.

171.   In the 2014 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $17,933,358.76 that the Government concedes it owes NHP for 2014.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), at 13.

172.   In the 2015 Risk Corridors Report, HHS and CMS acknowledged and published the full risk corridors payment amount, totaling $14,803,209.57 that the Government concedes it owes NHP for 2015.  *See* CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2015* (Nov. 19, 2015) at 6.

173.   The Government intends to pay NHP only $2,858523.29 of the $17,933,358.76 owed to NHP in 2014 risk corridors payments.

174.   Congress's failure to appropriate sufficient funds for risk corridors payments due for 2014 and 2015 did not defeat or otherwise abrogate the United States' contractual obligation to make full and timely risk corridors payments.

175.   The Government's failure to make full and timely 2014 risk corridors payments to NHP is a material breach of the implied-in-fact contract.

176.   The Government's failure to make full and timely 2015 risk corridors payments to NHP is a material breach of the implied-in-fact contract.

177.   As a direct result of the breach of the implied-in-fact contract entered into with NHP, NHP has been damaged in the amount of at least $29,878,000.04 together with any losses actually sustained as a result of the Government's breach, and such other damages and relief as this Court deems just and proper.

### COUNT V

**Taking Without Just Compensation
in Violation of the Fifth Amendment to the U.S. Constitution**

178.   Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

179.   The Government's actions complained of herein constitute a deprivation and taking of Plaintiff's property for public use without just compensation, in violation of the Fifth Amendment to the U.S. Constitution.

180.   NHP has a vested property interest in its contractual, statutory, and regulatory rights to receive statutorily-mandated risk corridors payments.  NHP had and has a reasonable investment-backed expectation of receiving the full and timely risk corridors payments payable to it under the statutory and regulatory formula, based on the QHP Agreements, Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. § 153.510), and HHS's and CMS's direct public statements.

181.   The Government expressly and deliberately interfered with and has deprived Plaintiff of property interests and its reasonable investment-backed expectations to receive full and timely risk corridors payments.  On March 11, 2014, HHS for the first time announced, in direct contravention of Section 1342 of the ACA, 45 C.F.R. § 153.510(b) and its previous public statements, that it would administer the Risk Corridors Program "in a budget neutral manner." HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. at 13,829.

182.   On April 11, 2014, HHS and CMS stated for the first time that 2014 risk corridors payments would be reduced pro rata to the extent of any shortfall in risk corridors collections. *See* CMS, *Risk Corridors and Budget Neutrality* (Apr. 11, 2014).

183.   HHS and CMS continue to refuse to make full and timely risk corridors payments to NHP, and, therefore, the Government has deprived Plaintiff of the economic benefit and use of such payments.

184.   The Government's action in withholding, with no legitimate governmental purpose, the full and timely risk corridors payments owed to NHP constitutes a deprivation and taking of Plaintiff's property interests and requires payment to Plaintiff of just compensation under the Fifth Amendment of the U.S. Constitution.

185.   NHP is entitled to receive just compensation for the United States' taking of its property in the amount of at least $29,878,000.04, together with interest, costs of suit, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against the Defendant, the United States of America, and requests the following relief:

(1)   That the Court award monetary relief in the amount Plaintiff is entitled to under Section 1342(b)(l) of the ACA and of 45 C.F.R. § 153.510(b) regarding the 2014 and 2015 risk corridors payments;

(2)   That the Court award damages sustained by Plaintiff as a result of the Government's breach of the implied covenant of good faith and fair dealing contained in the QHP Agreements;

(3)   That the Court award damages sustained by Plaintiff as a result of the Government's breach of its implied-in-fact contract with Plaintiff;

(4)   That the Court award damages sustained by Plaintiff as a result of the Government's breach of its express contract;

(5)   That the Court award just compensation for the United States' taking of

Plaintiff's property in the amount of at least $29,878,000.04;

(6)     That the Court award appropriate declaratory relief, including but not limited to a declaration that the Government is obligated to make 2015 and 2016 risk corridors payments to Plaintiff within 30 days of determination of the payment amount;

(7)     That the Court award Plaintiff such additional damages and other monetary relief as is available under applicable law;

(8)     That the Court award all available interest, including, but not limited to, post-judgment interest, to Plaintiff;

(9)     That the Court award all available attorneys' fees and costs to Plaintiff; and

(10)     That the Court award such other and further relief to Plaintiff as the Court deems just and proper.

Dated: December 16, 2016

Respectfully submitted,

Donoghue Barrett & Singal, P.C.

By: */s/ William A. Sinnott*
William A. Sinnott
M.A. Bar No.: 547423
David A. Chorney
M.A. Bar No.: 694859
Donoghue Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA 02108
1 (617) 598-6700